OPINION
{¶ 1} Defendant-Appellant, Betty Jean Hawkins ("Betty Jean"), appeals a Marion County Juvenile Court judgment, granting Marion County Children's Services ("MCCS") permanent custody of Lisa Brieanna Hawkins ("Brieanna") and Richard Lane (hereinafter referred to jointly as the "children"). Betty Jean contends the juvenile court erred in not appointing counsel for the children, in allowing the guardian ad litem to submit a report without meeting with the children, in allowing the guardian ad litem to submit a report after the permanent custody hearing and in relying on the testimony of Dr. McIntire. Additionally, Betty Jean contends that the juvenile court erred in finding that the children could not be placed with Betty Jean within a reasonable amount of time, that Hawkins failed to remedy the conditions that caused the children's removal and that there was clear and convincing evidence that an award of permanent custody to MCCS was in the best interest of the children. Based on the following, the judgment of the trial court is affirmed.
 {¶ 2} Betty Jean is the biological mother of Brieanna, born October 8, 2000, and Richard, born September 17, 1997. In February of 2002, after receiving a referral that Bobby Hawkins ("Bobby"), Betty Jean's husband (hereinafter Betty Jean and Bobby jointly referred to as the "Hawkins") and the biological father of Brieanna, had sexually abused Richard, MCCS became involved with the Hawkins and their children. Following an investigation, MCCS filed a complaint alleging sexual abuse and excessive discipline.
 {¶ 3} In April of 2002, the court found the children to be dependent, but allowed the children to remain in the Hawkins' custody. Additionally, a safety plan was filed, which addressed appropriate discipline and supervision, as well as appropriate diaper care for Brieanna.
 {¶ 4} In June of 2002, while living at a homeless shelter, MCCS received several calls regarding the Hawkins inappropriate discipline, inadequate supervision, inadequate nutrition, and their inability to provide for their children. Subsequently, MCCS filed another complaint and the children were removed from the Hawkins' custody. The children have been in foster care together since their removal.
 {¶ 5} Subsequently, a case plan was filed by MCCS and signed by both Betty Jean and Bobby. The case plan listed the following family strengths:
1. The children are treated fairly within the family;
 2. Secure attachment and bonding between the children andtheir parents;
 3. There is no history of substance abuse; and,
 4. There is no history of domestic violence or assaultivebehaviors within the home.
 {¶ 6} The case plan listed the following family concerns:
1. The children are too young to protect themselves or providefor their own basic needs;
 2. The children have possible developmental delays;
 3. Betty Jean and Bobby's parenting skills and knowledge, aswell as their overall level of cognitive functioning;
 4. Betty Jean's history of abuse and neglect as a child; and,
 5. Bobby has very limited economic resources (and Bobby hashad gambling issues in the past) and Betty Jeans has no incomeand no stable housing at this time.
 {¶ 7} To comply with the case plan, the Hawkins were required to adequately provide for the children's basic needs and effectively supervise, discipline and educate the children by attending and participating in parenting classes, as well as by applying the skills learned in those classes. Additionally, both parents were to submit to a psychological evaluation and comply with recommendations following such an evaluation. The Hawkins were to address the children's developmental delays by follow up on the children's developmental issues that were currently being addressed. Betty Jean was to address her own abuse issues by attending and participating in individual counseling. And, finally, both parents were to obtain financial independence by obtaining and maintaining a job or alternative economic resources and to obtain adequate housing for their children.
 {¶ 8} In July of 2003, MCCS filed a motion for permanent custody. In September of 2003, the court held a hearing on the matter. At the hearing, MCCS presented the testimony of Stephanie Millhouse, the caseworker for both children, Stephanie Kearns, an adoption placement caseworker, and Dr. Donald McIntire, the psychologist who performed the psychiatric evaluation on Betty Jean. Betty Jean, as well as Mike Detwiler, Betty Jean's current boyfriend, testified on her behalf. Neither Bobby Hawkins nor Richard's biological father attended or participated in the hearing.
 {¶ 9} During Millhouse's testimony, she stated that she had been the ongoing caseworker in the children's case and that she had developed and gone over the case plan with both Betty Jean and Bobby. She stated that she had specifically instructed Betty Jean as to the requirements of the case plan and offered transportation and other support to help her achieve the requirements of the plan. However, Betty Jean had only begun working on the case plan specifics since the time that MCCS filed its request for permanent custody. Prior to the July filing, Betty Jean had not attended parenting classes or counseling sessions and had not obtained a psychiatric evaluation. Since MCCS's filing, however, Betty Jean had attended seven out of eight parenting classes, obtained the psychiatric evaluation and gone to four counseling session.
 {¶ 10} Millhouse testified that Betty Jean had been unable to find and maintain a job or obtain other financial resources and been unable to maintain safe, suitable housing. Betty Jean had had eighteen different addresses since the case was opened in March of 2002. Millhouse stated that Betty Jean had essentially lived from man to man, living with whomever she was seeing at the time. Additionally, Betty Jean had been in and out of homeless and domestic violence shelters. Millhouse testified that Betty Jean had been with her current boyfriend, Mike Detweiler for the last eleven months; however, she and Detweiler also moved eleven times, including to Chester, South Carolina, for a three month period, to Columbus, Ohio, for several weeks, and had been in homeless shelters. Finally, Millhouse stated that, since MCCS's filing of the request for permanent custody, Betty Jean and Detweiler had maintained a one bedroom apartment through a subsidized housing program for the seven weeks prior to the hearing.
 {¶ 11} Millhouse also testified that she was concerned with Betty Jean's ability to protect her children. Betty Jean had failed to intervene when Bobby had excessively disciplined Richard by making him stand in a corner for twenty-five minutes and hit him with a belt over thirty times. Millhouse testified that Betty Jean was unable to understand why these were excessive punishment.
 {¶ 12} Finally, Millhouse testified that of fifty-five possible visits, Betty Jean attended only twenty-three and that Betty Jean disappeared for a three month period of time. While Millhouse recognized the improvements made by Betty Jean over the last few months, she ultimately recommended that the court grant permanent custody to MCCS.
 {¶ 13} MCCS also presented the testimony of adoption placement caseworker Kearns, who recommended the children remain with the foster family whom they had lived with for over a year. She stated that the children had developed significant relationships with the foster parents and that placement for adoption will be made if MCCS were to receive permanent custody.
 {¶ 14} Dr. McIntire, who performed Betty Jean's psychiatric evaluation, also testified regarding Betty Jean's ability to care for the children. Dr. McIntire testified that Betty Jean had cerebral palsy and diagnosed her with borderline mental function, demonstrating substantial deficits in her parenting and understanding abilities. While it was not impossible for Betty Jean to parent the children, Dr. McIntire testified that it would a long-term process, which would require close monitoring and a great deal of support. Dr. McIntire was concerned with Betty Jean's ability to keep the children safe and did not believe that she had the ability to independently care for the children. Dr. McIntire opined that it was doubtful that Betty Jean could be able to parent within one year of the date of the hearing, indicating that there were important areas of understanding that she might never improve on.
 {¶ 15} Detwiler, who testified on Betty Jean's behalf, stated that Betty Jean loved her children very much and should be given a chance. He testified that he had been with Betty Jean for almost a year, that the two presently lived together, and that he would help her raise the children. Detwiler also testified that he had two of his own children, one of whom was in foster care. Detwiler testified that he was not providing support for either child and that he was not participating in any efforts to obtain custody of his own child in foster care.
 {¶ 16} Finally, Betty Jean testified that she loved her children and that she wanted to regain custody. Additionally, Betty Jean attempted to explain her delay in starting work on the case plan. According to Betty Jean, she had been unclear about the case plan when it was developed and was feeling overwhelmed by everything that needed to be done. She also testified to the progress she had made on the case plan since MCCS filed its request for permanent custody.
 {¶ 17} Upon the conclusion of the hearing, the court requested that the guardian ad litem, Ted Babich, file a written recommendation, to which Betty Jean's counsel stipulated. In his written recommendation, Babich stated the recommendation was based upon the following items:
1) Reviewing all pleadings including case plans, motions andentries;
 2) Attending Court hearings including the Pre-trial andAdjudication * * *; Court Review * * *; Shelter Care Hearing* * *; Pre-trial * * *; Adjudication * * *; and Case Plan Review;
 3) Attending Semi-annual Administrative reviews * * *;
 4) Numerous communications with the foster parents, numerouscommunications with MCCSB workers, and unsuccessful attempts toset up an interview with the parents through their attorneys.Because of their age, no attempt was made to interview the minorchildren; and,
 5) Participating in the * * * hearing on MCCSB's motion forpermanent custody. * * *.
 {¶ 18} Based on the above, Babich found that MCCS prepared a reasonable case plan and made diligent efforts in assisting Betty Jean's reunification with the children. Additionally, Babich opined that Betty Jean failed to remedy the reasons for the children's removal and that she failed to comply with the case plan. Acknowledging Betty Jean's recent improvement and Dr. McIntire's doubts that she could be ready to independently parent within a year, Babich noted:
If Mother had started working on the case plan when thechildren were first removed, we might know if she could overcomeher many deficits in a year. Given that Dr. McIntire thinks itwould take a number of years for some deficits and that otherdeficits may never be overcome, it would be unreasonable to delaythe award of permanent custody.
 {¶ 19} Babich found that Betty Jean's actions demonstrated a lack of commitment to the children. Specifically, Babich cited her visitation and phone calling record, her waiting over a year before beginning to work on the case plan, her moving to protect and be with the men in her life, and her failure to find and maintain a job to financially support her children.
 {¶ 20} Finally, Babich opined that it was in the children's best interest to be placed within the permanent custody of MCCS, so that a permanent home could be established.
 {¶ 21} Based upon the testimony and evidence presented at the September hearing, as well as Babich's report, the court found it was in the best interests of the children to award permanent care and custody to MCCS, pursuant to R.C. 2141.414(D). It is from this judgment Betty Jean appeals, presenting the following assignments of error for our review.
 Assignment of Error No. I The trial court erred in not appointing counsel for RichardLane and Lisa Brieanna Hawkins.
 Assignment of Error No. II The guardian ad litem failed to submit a report that indicatedthe desire of his wards and the guardian ad litem'srecommendations.
 Assignment of Error No. III The trial court erred in permitting the guardian ad litem tosubmit his written recommendations after the permanent custodyhearing in violation of ohio revised code section 2151.414(C).
 Assignment of Error No. IV The trial court erred in relying on the testimony of Dr.Mcentyre (sic.) Who was not offered as or qualified by the courtto be an expert witness.
 Assignment of Error No. V The trial court erred when it found that the children couldnot be placed with defendant-appellant within a reasonable time.
 Assignment of Error No. VI The trial court erred in finding that mother failed to remedythe conditions that caused the children's removal.
 Assignment of Error No. VII The trial court erred in finding clear and convincing evidencethat an award of permanent custody to marion county childrenservices was in the best interest of Richard Lane and LisaBrieanna Hawkins.
 {¶ 22} Due to the nature of appellant's claims, we will be addressing his assignments of error out of order.
 Assignments of Error Nos. V, VI, VII {¶ 23} In the fifth, sixth and seventh assignments of error, Betty Jean asserts that the court erred in finding that the children could not be placed within Betty Jean's care within a reasonable amount of time, that Betty Jean failed to remedy the conditions that caused removal of the children and that, by clear and convincing evidence, an award of custody to MCCS was in the children's best interests. Because these assignments of error are interrelated, we will address them together.
 {¶ 24} We begin our review of this issue by noting that "[i]t is well recognized that the right to raise a child is an `essential' and 'basic civil right.'" In re Hayes (1997),79 Ohio St.3d 46, 48, citing In re Murray (1990),52 Ohio St.3d 155, 157. Thus, "a parent's right to the custody of his or her child has been deemed `paramount'" when the parent is a suitable person. In re Hayes, supra (citations omitted); In re Murray,
supra. Because a parent has a fundamental liberty interest in the custody of his or her child, this important legal right is "protected by law and, thus, comes within the purview of a `substantial right[.]'" In re Murray, supra. Based upon these principles, the Ohio Supreme Court has determined that a parent "must be afforded every procedural and substantive protection the law allows." In re Hayes, supra (citation omitted). Thus, it is within these constructs that we now examine the assignment of error.
 {¶ 25} Once a child has been placed in the temporary custody of a children's services agency, the agency is required to prepare and maintain a case plan for that child. R.C.2151.412(A)(2). Further, R.C. 2151.412(E)(1) states that "[a]ll parties, including the parents * * * are bound by the terms of the journalized case plan." One of the enumerated goals of a case plan for a child in the temporary custody of a children's services agency is "[t]o eliminate with all due speed the need for the out-of-home placement so that the child can safely return home." R.C. 2151.412(F)(1)(b). This goal is commonly referred to as reunification.
 {¶ 26} However, once an agency files a motion for permanent custody, the Revised Code requires that the trial court determine, by clear and convincing evidence, that a grant of permanent custody to the agency that has so moved is in the best interest of the child and that one of four enumerated factors applies. R.C. 2151.414(B)(1). Included in this list is that
The child has been in the temporary custody of one or morepublic children service agencies or private child placingagencies for twelve or more of a consecutive twenty-two monthperiod * * *. R.C. 2151.414(B)(1)(d).
 {¶ 27} The Supreme Court of Ohio has held that "[c]lear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear andunequivocal." Cross v. Ledford (1954), 161 Ohio St. 469, 477, citing Merrick v. Ditzler (1915), 91 Ohio St. 256. In addition, when "the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." Cross,
supra (citations omitted). Thus, we are required to determine whether the evidence was sufficient for the trial court to make its findings by a clear and convincing degree of proof.
In the case sub judice, the court made the following conclusions of law:
The Court finds by clear and convincing evidence that motherhas failed to regularly visit or communicate with her childrenwhen she could have done so. The Court finds it is the bestinterest of the children to award permanent care and custody ofthe children, pursuant to 2141.414D.
 These children have been in foster care for more than 15months prior to the hearing on September 15, 2003. They have beenin the same foster-to-adopt home for a year, have bonded with thefoster family, and could be adopted by the family.
 The biological parents have failed to provide physical,emotional and financial support for their children. * * *Although mother indicated a willingness to comply with the caseplan at this time, she has failed to do so in the past, and it isapparent from the testimony that she is going to be unable to doso in the next 12 months.
 {¶ 28} In its judgment entry, the court noted that "mother has demonstrated a lack of commitment to her children by her failure to comply with the case plan." Specifically, the court cited Betty Jean's failure to begin working on the specifics of the case plan until MCCS's request for permanent custody had been filed, her failure to protect her children, her failure to find a job and maintain and income; her failure to maintain a safe, suitable home, and her failure to maintain a regular visitation schedule. Additionally, the court referred to Dr. McIntire's testimony regarding Betty Jean's ability to participate in the care of the children. The court noted that while Dr. McIntire did state Betty Jean did have the ability to take care of her children, he went on to note that she would require close monitoring, and would take a great deal of support.
 {¶ 29} In the seventh assignment of error, Betty Jean asserts that the court erred in finding that awarding MCCS's motion for permanent custody was in the best interests of the children.
 {¶ 30} In making a determination of the best interests of the child at a permanent custody hearing, "the court shall consider all relevant factors, including, but not limited to, * * *: (1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers * * *, and any other person who may significantly affect the child; (2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem * * *; (3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty two month period * * *; (4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; (5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child." R.C. 2151.414(D).
In its judgment entry, the court clearly considered the interaction and interrelationship of the children with Betty Jean, as well as their foster family. Considering the ages of the children and the testimony of Betty Jean and caseworker Millhouse, the children's wishes could be gleaned from the record. Additionally, the court discussed in depth the custodial history of the children. The court also heavily considered the children's need for a legally secure permanent placement. Finally, the court discussed at length the fact that Betty Jean demonstrated a lack of commitment to her children.
 {¶ 31} Upon review of the entire record, we find that the court's findings are supported by clear and convincing evidence. Additionally, we find the court has properly considered all the necessary factors under R.C. 2151.414(D). Accordingly, we find the juvenile court's decision to award permanent custody to MCCS was proper, for testimony showed by clear and convincing evidence that it was in the best interests of the children to have them permanently removed from their natural parents. Thus, the seventh assignment of error is overruled.
 {¶ 32} In Betty Jean's fifth and sixth assignments of error, she relies upon the assumption that the court was required to make a determination as to whether the child could have been placed with the parent within a reasonable amount of time or should not be placed with the parent, under R.C. 2151.414(E). R.C. 2151.414(E) requires a court to consider sixteen enumerated factors to make such a determination.
 {¶ 33} In order to grant MCCS permanent custody under R.C.2151.414(B)(1), the court only needed to make two determinations: (1) that granting MCCS permanent custody would be in the best interests of the children, and (2) that one of four enumerated factors applies. The enumerated factors include:
(a) The child is not abandoned or orphaned or has not been inthe temporary custody of one or more public children servicesagencies or private child placing agencies for twelve or moremonths of a consecutive twenty-two month period ending on orafter March 18, 1999, and the child cannot be placed with eitherof the child's parents within a reasonable time or should not beplaced with the child's parents.
 (b) The child is abandoned.
 (c) The child is orphaned, and there are no relatives of thechild who are able to take permanent custody.
 (d) The child has been in the temporary custody of one or morepublic children services agencies or private child placingagencies for twelve or more months of a consecutive twenty-twomonth period ending on or after March 18, 1999.
 {¶ 34} Thus, pursuant to the enumerated factors listed in R.C. 2151.414(B)(1), an R.C. 2151.414(E) determination, as to whether a child cannot be placed with either parent within a reasonable amount of time or should not be placed with the parent, is only required under subpart (a) of that section of the Revised Code. Under subparts (b) through (d), the Revised Code only requires the court to make a best interest determination. It is unnecessary for the court to make any further findings. In reRidenour, 11th Dist. Nos. 2003-L-146, 2003-L-147, 2003-L-148, 2004-Ohio-1958, ¶ 53.
 {¶ 35} Here, the court found that the children had been in foster care for fifteen consecutive months prior to the permanent custody hearing, which falls under subpart (d) of R.C.2151.414(B)(1). That finding is clearly supported by the record. Accordingly, the court's review of MCCS's motion for permanent custody did not require the additional findings pursuant to R.C.2151.414(E). Although the court made a finding that the children could not or should not be placed with their parents within a reasonable time, such a finding was unnecessary under R.C.2151.414(B)(1). In re Rodgers (2000), 138 Ohio App.3d 510,516-521.
 {¶ 36} Because the court was only required to make a best interest determination and because that determination has been upheld, we cannot find the court erred. Thus, the fifth and sixth assignments of error are overruled.
 Assignments of Error Nos. I II {¶ 37} In the first assignment of error, Betty Jean asserts that the court erred in not appointing independent counsel to represent the children in the proceedings below. In the second assignment of error, Betty Jean asserts that the guardian ad litem's failure to determine or include the children's wishes in his report was error. Because these assignments are interrelated, we will address them together.
 {¶ 38} According to Betty Jean, Richard's inquiry into his mother's progress can be construed as an interest to be reunited with Betty Jean. And, although Brieanna's speech was minimal, the fact that MCCS listed the secure attachment and bond between the parents and the children further shows there might have been some nonverbal indication of the children's wishes. Thus, because the court neither inquired into nor appointed counsel for the children, they were unrepresented throughout the entire proceedings. Additionally, because the children were not represented, the guardian ad litem never met with the children, the children did not testify, and the court did not conduct an in camera interview with the children, the children's wishes were never made known to the court.
 {¶ 39} R.C. 2151.352 provides, in pertinent part:
A child or the children's parents, custodian, or other person in loco parentis is entitled to representation by legal counsel at all stages of the proceedings under this chapter or Chapter 2152. of the Revised Code and if, as an indigent person, any such person is unable to employ counsel, to have counsel provided for the person pursuant to Chapter 120. of the Revised Code. If a party appears without counsel, the court shall ascertain whether the party knows of the party's right to counsel and of the party's right to be provided with counsel if the party is an indigent person. The court may continue the case to enable a party to obtain counsel or to be represented by the county public defender or the joint county public defender and shall proved counsel upon request pursuant to Chapter 120. of the Revised Code. Counsel must be provided for a child not represented by the child's parent, guardian, or custodian. If the interests of two or more such parties conflict, separate counsel shall be provided for each of them.
Juv.R. 4(A) provides:
Every party shall have the right to be represented by counsel and every child, parent, custodian, or other person in loco parentis the right to appointed counsel if indigent. These rights shall arise when a person becomes a party to a juvenile court proceeding. When the complaint alleges that a child is an abused child, the court must appoint an attorney to represent the interests of the child. This rule shall not be construed to provide for a right to appoint counsel in cases in which the right is not otherwise provided for by constitution or statute.
{¶ 40} The Ohio Supreme Court noted in State ex. rel. Asberryv. Payne (1998), 82 Ohio St.3d 44, 46, that "Ohio, through R.C.2151.352, provides a statutory right to appointed counsel that goes beyond constitutional requirements." Additionally, the court noted that "under the plain language of R.C. 2151.352, indigent children, parents, custodians, or other persons in locoparentis are entitled to appointed counsel in all juvenile proceedings." Id. at 48. More specifically, the issue of the appointment of counsel for children who are the subject of proceedings to terminate parental rights has recently been addressed by the Supreme Court. In re Williams,101 Ohio St.3d 398, 2004-Ohio-1500. Considering the discrepancy between the Eleventh District's decision in In re Williams, 11th Dist. Nos. 2003-G-2498, 2003-G-2499, 2003-Ohio-3550 (hereinafter referred to as "Williams II") and the Second District's decision in In re Alfrey, 2d Dist. No. 01CA0083, 2003-Ohio-608, the Ohio Supreme Court took up the "certified issue concerning the appointment of counsel for children who are the subject of proceedings to terminate parental rights." Williams,2004-Ohio-1500 at ¶ 11.
 {¶ 41} In In re William the Ohio Supreme Court considered the issues raised in Williams II and Alfrey. 2004-Ohio-1500
at ¶ 13-14. The Supreme Court centered it inquiry around R.C.2151.352 and Juv.R. 4(A). Id.
 {¶ 42} The Court noted that the Williams II court and many other appellate courts had properly determined that "a juvenile had a right to counsel in a proceeding to terminate parental rights, based on the juvenile's status as a party to the proceedings," under R.C. 2151.352, Juv.R. 4(A) and Juv.R. 2(Y). Id., citing In re Janie M. (1999), 131 Ohio App.3d 637, 639,In re Clark (2001), 141 Ohio App.3d 55, 60-61. Further, the Court recognized that the Williams II court, "[l]ike other courts * * * recognized that courts should make a determination, on a case-by-case basis, whether the child actually needs independent counsel, taking into account the maturity of the child and the possibility of the child's guardian ad litem being appointed to represent the child." Williams, 2004-Ohio-1500 at ¶ 17. The Court acknowledged the possibility of a "fundamental conflict in a dual-representation situation," noting that the duty of a guardian ad litem is to "recommend to the court what the guardian feels is in the best interest" of the child, while the duty of a lawyer to a child client is "to provide zealous representation" for the child's position. Id. at ¶ 18.
 {¶ 43} In its discussion of the Alfrey case, the Court stated that the Second District did not cite or consider the effect of Juv.R.2(Y), which specifically defines "party" as a child. Id. at 20. Relying on R.C. 2151.352 and its previous decision in Asberry, the Court was satisfied that the plain language of the statute did in fact entitle a child, who is the subject of a juvenile court proceeding to terminate parental rights, to the appointment of counsel in certain circumstances. Id. at ¶ 23. Accordingly, the court affirmed the decision of the Eleventh District's in Williams II.
 {¶ 44} Thus, in light of the Supreme Court's recent decision in Williams, namely that a child who is the subject of a juvenile court proceeding to terminate parental rights is a party to that proceeding and is entitled to independent counsel in certain circumstances, we must determine whether this case involves one of those circumstances where independent counsel must be appointed.
 {¶ 45} While Betty Jean correctly points out that neither the court nor the guardian ad litem ever had any direct interaction with the children, we cannot find that the court's failure to appoint counsel constitutes error in this case. Thus, while the court was required to consider those wishes under R.C.2151.414(D), we are satisfied that through Betty Jean and caseworker Millhouse's testimony the court was made aware of Richard's possible desire to be placed with his mother. Moreover, upon a review of the entire record, based upon the children's lack of maturity in conjunction with the overwhelming evidence supporting the court's findings that the children's best interests were to be served by awarding custody to MCCS, we conclude that any error by the trial court or the guardian ad litem in not specifically probing into the children's wishes was essentially harmless.
 {¶ 46} Accordingly, the trial court and/or the guardian ad litem would normally be well advised to more specifically address the wishes of the children in these cases, following the decisions of the Ohio Supreme Court in Williams. However, we cannot say that in the circumstances of this case, thatWilliams would require the appointment of counsel for either Richard or Brieanna. Nor can we find the guardian ad litem's failure to determine or include in his report the children's wishes to be reversible error. Thus, the first and second assignments of error are overruled.
 Assignment of Error No. III {¶ 47} In the third assignment of error, Betty Jean asserts the trial court erred in permitting the guardian ad litem to submit his written recommendations after the permanent custody hearing.
 {¶ 48} Babich, the guardian ad litem, took part in the permanent custody hearing and filed a one page report on the day of that hearing. Upon the close of evidence, the court asked Babich if he would like to supplement his report. At that point Betty Jean's counsel stated that he did not wish to cross-examine Babich at the hearing and that he would read the report and "let the court know" if he wanted to cross-examine Babich's report. Babich filed an additional report with the court, twelve days after the permanent custody hearing. At that time, the court, through a judgment entry, notified all parties they had ten days to notify the court if they wished to cross-examine Babich's report. Bettty Jean's counsel never notified the court that he wished to cross-examine the report.
 {¶ 49} A report of a guardian ad litem should be filed either before or at the time of the hearing, not afterward. R.C.2151.414(C). However, Betty Jean waived any objection to the later submission of the report by stipulating to the late filing at the hearing. "[A]ny claim of error arising from the guardian ad litem's failure to file a written report is waived when the argument is not raised in the trial court." In re Cordell (Apr. 2, 1992), 8th Dist. Nos. 60049, 60050, unreported. Accordingly, the third assignment of error is overruled.
 Assignment of Error No. IV {¶ 50} In the fourth assignment of error, Betty Jean contends that the courts erred in relying on the testimony of Dr. McIntire, claiming McIntire was never offered or qualified as an expert witness. However, Betty Jean never objected to the testimony of McIntire, never requested that the court make MCCS qualify him as an expert, and never requested that McIntire's testimony be stricken. Without such a request, the trial court did not err by permitting the testimony to be admitted. See Pottorf v. Bray, 3d Dist. No. 17-03-09, 2003-Ohio-4255, ¶ 5. Accordingly, the fourth assignment of error is overruled.
 {¶ 51} Having found no error prejudicial to the appellant herein, in the particulars assigned and argued, we affirm the judgments of the trial court.
Judgments affirmed.
 Cupp and Bryant, JJ., concur.